**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **SSG EZRA THOMAS and RACHEL THOMAS, individually and as parents and guardians of E.T. and E.T.,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **vs.** | ) ) |
| **CORVIAS GROUP, LLC, BRAGG COMMUNITIES, LLC, CORVIAS MANAGEMENT-ARMY, LLC, BRAGG-PICERNE PARTNERS, LLC, CORVIAS MILITARY LIVING, LLC, and CORVIAS CONSTRUCTION, LLC,** | ) ) ) ) ) ) |
| **Defendants.** | ) ) ) |

## COMPLAINT

Plaintiffs Staff Sergeant Ezra Thomas and Rachel Thomas, individually, and as parents and guardians[1] of their two minor children, E.T and E.T.,[2] hereby file their Complaint against the Defendants and allege the following:

## I.    NATURE OF THE ACTION

1.    This lawsuit is brought by a military family who leased military housing at Fort Bragg, North Carolina from the privatized company Defendants, who provided egregious, "slumlord" rental housing, unfair and deceptive service, and fraudulent maintenance.  Plaintiffs held a valid and enforceable occupancy and possessory interest in the leasehold property during the pertinent times.   As further described below, Defendants conspired to conceal harmful environmental and structural housing defects from Plaintiffs as well as other unsuspecting service

---

[1] N.C.G.S. § 1A-1, N.C.R. Civ. P. 17(b)(1).
[2] See Fed. R. Civ. P. 5.2(a)(3).

members and their families reflecting an unfair and deceptive pattern and practice. Defendants knowingly leased substandard homes and compounded that fact by providing cut-rate, abjectly inadequate repair and maintenance service, all while charging excessive rents equaling servicemembers' Basic Allowance for Housing ("BAH"). Once servicemembers signed the form lease, also known as the Resident Occupancy Agreement ("ROA"), Defendants' service vendors concealed defects from tenants. Defendants maintained misleading maintenance records. The Government Accountability Office ("GAO") found this recordkeeping to be unreliable.[3] Defendants' culture of concealment was driven by corporate greed where financial gains were maximized to the detriment of military families.

2. The Court need not take Plaintiffs' word for it: a critical mass of tenant pleas for help has led to Congressional and federal governmental agency investigation, hearings and reports which have revealed the unreasonable practices and intolerable conditions. After years of Defendants releasing slanted brand messaging on customer satisfaction, the nonprofit Military Family Advisory Network ("MFAN") released a report reflecting that over 67%[4] of all Bragg families surveyed reported manifest effects from maintenance, repairs and remediation. The Department of the Army Inspector General corroborated the servicemember dissatisfaction.[5] Heads of the largest companies, including John Picerne of Corvias, were required to testify before

---

[3] GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, Dec. 3, 2019, p. 1 ("However, based on GAO's analysis of data provided by all 14 private partners, these data cannot reliably be used for ongoing monitoring of privatized housing because of data anomalies and inconsistent business practices in how these data are collected.") (emphasis added).

[4] MFAN, Privatized Military Housing, Final Research Report: Living Conditions of Families in Privatized Military Housing, May 2019, p. 155. *See also* Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("Shannon Razsadin, executive director of the Military Family Advisory Network … said the survey showed that military families ranked Corvias among the poorest-performing of the private property management companies serving military bases.").

[5] Inspector General, Department of the Army, Report No. ID-1903, General Special Interest Item Assessment of the Residential Communities Initiatives, 14 February – 22 March 2019. Sites inspected included Fort Bragg. *Id.*, p. 3.

Congress and admitted, under oath, unacceptable conditions.[6]  Mr. Picerne admitted the same in related interviews.[7]  Defense Secretary Esper singled out the Corvias-created conditions at Bragg as "**unconscionable**."[8]  This has led to announcements of sweeping structural capital investments to remedy the practices.[9]

3.     This action confronts the profitability of deceit and reveals the opportunistic behavior of Corvias, a construction and property management firm originally founded in 1998 as Picerne Military Housing to provide "dramatically improved housing for America's service members and their families."[10]   The company designed its website to appeal to relocating servicemembers and tout high-quality housing, service and maintenance.  Under North Carolina law, unfair and deceptive trade practices in landlord-tenant relations are actionable.  Here, the Defendants' conduct has been unfair and deceptive and in violation of landlord-tenant duties.  The Plaintiffs are entitled to relief, including on their claims for private nuisance, negligence. punitive

---

[6] Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("In February testimony to the Senate Armed Services Subcommittee on Personnel and Readiness, Picerne stood out from other property management executives by offering an apology for how issues with military housing were allowed to accumulate.  'We let down some of our residents,' Picerne said. 'I'm sorry and we are going to fix it. We will get to the bottom of this problem and return to the gold standard.'").

[7] Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("The head of a company named in a lawsuit charging mold infestation and other substandard conditions in on-base housing at Fort Meade, Maryland, last week acknowledged a history of neglect by private firms and the Defense Department in managing military housing and pledged $325 million for fixups. Management overall 'went sideways' in a series of poor decisions and inaction on budgeting and oversight, John Picerne, founder and chief executive officer of the Rhode Island-based Corvias Group, said in an interview with Military.com before the Fort Meade lawsuit was filed.").

[8] Military.com, Problems with Military Housing Began Decades Ago, Manager Says, Nov. 14, 2019 ("Picerne said at the hearing the bases that will benefit from renovations funded by the millions Corvias plans to raise include Fort Bragg, North Carolina, which has been singled out by Defense Secretary Mark Esper as one of the worst in the Army for military housing.  In March, following a visit to Fort Bragg and meetings with military families, Esper, who was Army Secretary at the time, termed housing conditions at the post 'unconscionable.'").

[9] *See supra* at n.4.

[10] *See* Corvias website at http://www.corviasmilitaryliving.com/.  *See also* content from the historical Corvias website as archived at https://archive.org/web/.  *Cf. United States v. Bondars,* 2018 U.S. Dist. LEXIS 229393, *6-7 (E.D. Va. Aug. 20, 2018) (Wayback Machine results admissible – "Here, the Wayback Machine screenshots introduced by the Government comport with the requirements and purpose of Rule 902(13). They are established by a certificate of an Internet Archive Official, Office Manager Christopher Butler, and are not deficient in their authenticity. Further, they meet all procedural requirements under Rules 902(11) and 902(12).").

damages, breach of the warranty of habitability, breach of contract, and breach of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").[11]

## II.   **THE PARTIES**

### a.  **Plaintiffs.**

4.      Staff Sergeant **Ezra Thomas** (E-6) was a tenant of the privatized military housing owned and managed by one or more of Defendants at Fort Bragg, from in or about 2013 to 2019. Today he is a citizen and resident of Illinois.

5.      Plaintiff **Rachel Thomas** is the spouse of SSG Thomas and has lawfully occupied the Unit during the pertinent times as well, and today is a citizen and resident of Illinois.

6.      Ezra and Rachel Thomas are the parents and guardians of two minor Plaintiffs, minor Plaintiff **E.T.** (older son) and minor Plaintiff **E.T.** (younger son).

### b.  **Defendants.**

7.      Defendant **Corvias Group, LLC** ("Corvias Group") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in East Greenwich, Rhode Island, or, Wilmington, Delaware, and at all times relevant, providing housing and other services for military servicemen and the owner of Corvias Military Living.[12]  It has identified itself as the parent company of Bragg-Picerne Partners[13] and of Corvias Military Living.[14]  Corvias Group, LLC is owned by John G. Picerne Business Trust, 2012.[15]  In prior

---

[11] N.C.G.S. § 75-1.1, *et seq.*  A plaintiff may plead a breach of the landlord-tenant statute imposing duties on the landlord under the implied warranty of habitability as a predicate to a UDTPA claim.  *See Dean v. Hill*, 171 N.C. App. 479, 615 S.E.2d 699 (2005); *Stolfo v. Kernodle*, 118 N.C. App. 580, 455 S.E.2d 869 (1995); *Creekside Apartments v. Poteat*, 116 N.C.App. 26, 33, 446 S.E.2d 826, 831, *rev. denied*, 338 N.C. 308, 451 S.E.2d 632 (1994); *Allen v. Simmons*, 99 N.C.App. 636, 394 S.E.2d 478 (1990).
[12] *Bragg Communities, LLC v. Illinois Union Ins. Co.*, No. 5:14-cv-00240-F (E.D.N.C.), Doc. 9; Doc. 16, amended complaint ¶ 3 (East Greenwich RI); No. 5:18-cv-00188-FL, Doc. 28 (Wilmington DE).
[13] No. 5:14-cv-00240-F, Doc. 10.
[14] No. 5:14-cv-00240-F, Doc. 11.
[15] *Hanna v. Amazon.com, Inc.*, No. 5:18-cv-00188-FL (E.D.N.C.), Doc. 28.

actions, Corvias Group has held itself out, including before this Court,[16] as "providing housing and other services for military servicemen" at Fort Bragg.

8.     Defendant **Bragg Communities, LLC** ("Bragg Communities") is a Delaware limited liability company with its principal place of business at Fort Bragg. It is authorized to do business in, and does business in, North Carolina. Its members include[17] Bragg-Picerne Partners, LLC, and the U.S. Department of the Army. At all relevant times, Bragg Communities provided housing, property management and other services for military servicemembers and their family members at Fort Bragg. Bragg Communities is listed as the "Owner" under the ROA form lease[18] signed by servicemember tenants. Pursuant to various agreements and a fifty-year ground lease with the Army, Bragg Communities is the owner of the Fort Bragg Privatized Housing Project.[19]

9.     Defendant **Corvias Management-Army, LLC** ("Corvias Management") is a Delaware limited liability company with its principal place of business at Fort Bragg. At all relevant times, Corvias Management was providing housing and other services for military servicemen at Fort Bragg. Corvias Management is listed as the "Property Manager" under the ROA form lease signed by servicemember tenants.

10.     Defendant **Bragg-Picerne Partners, LLC** ("Bragg-Picerne") is a Delaware limited liability company with its principal place of business in Rhode Island. Bragg-Picerne is a wholly-

---

[16] No. 5:18-cv-00188-FL, Doc. 1, ¶ 4.

[17] In a 2017 filing in this Court, Bragg Communities represented that its members were 1) Bragg-Picerne Partners, LLC, 2) the U.S. Department of the Army, and 3) AP Housing, LLC. *Hanna*, No. 5:18-cv-00188-FL, Doc. 28, filed Nov. 17, 2017, pp. 1-2. In a 2014 filing in a different case, Bragg Communities represented that its members were 1) Bragg-Picerne Partners, LLC, and 2) the U.S. Department of the Army. *Bragg Communities, LLC*, No. 5:14-cv-00240-F, Doc. 3-2, filed April 23, 2014, page 6 of 59, state court complaint ¶ 3. The most recent NC Secretary of State filing for Bragg Communities discloses only Bragg-Picerne Partners, LLC. 2020 Annual Report, SOS ID 0651859, CA 2020 1200 2578.

[18] An exemplar is available at the Corvias website at http://corviasmilitaryliving.com/global_content/resident_responsibilities/Bragg_Military_ROA.pdf (accessed Aug. 31, 2020).

[19] No. 5:18-cv-00188-FL, Doc. 3-2, ¶ 11.

owned subsidiary[20] of Corvias Military Living, LLC, which is its managing member.[21] At all relevant times, Bragg-Picerne provided housing and other services for military servicemen at Fort Bragg. Bragg-Picerne is the managing member[22] of Bragg Communities.

11. Defendant **Corvias Military Living, LLC** ("Corvias Military Living") is a Rhode Island limited liability company with its principal place of business in Rhode Island.[23] Corvias Military Living was formerly known as Picerne Military Housing, LLC.[24] Corvias Military Living has provided housing and other services for military servicemen at Fort Bragg. Corvias Military Living affiliates are involved in the development, construction and property management of the privatized military housing project.[25] The corporate parent and sole member of Corvias Military Living is Corvias Group, LLC.[26] During pertinent times, employees of Corvias Military Living, including Ron Phillips, as of 2014 the Regional Vice President of Construction, had offices at Fort Bragg, including at 903 Armistead Street, Fort Bragg.[27] Corvias Military Living has held itself out in pleadings filed in this Court as the owner of housing units at Fort Bragg, and, as the owner of Bragg Communities.[28]

12. Defendant **Corvias Construction, LLC** ("Corvias Construction") is a Delaware limited liability company with its principal place of business in East Greenwich, Rhode Island.[29] Effective June 16, 2016, Corvias Construction was the successor by merger to Picerne

---

[20] No. 5:14-cv-00240-F, Doc. 3-2, page 6 of 59, state court complaint ¶ 3.
[21] No. 5:14-cv-00240-F, Doc. 10.
[22] No. 5:14-cv-00240-F, Doc. 9.
[23] No. 5:14-cv-00240-F, Doc. 3-2, state court complaint ¶ 5.
[24] No. 5:14-cv-00240-F, Doc. 63 pp. 4-5.
[25] No. 5:14-cv-00240-F, Doc. 63 pp. 2-3.
[26] No. 5:14-cv-00240-F, Doc. 11; No. 5:18-cv-00188-FL, Doc. 28.
[27] No. 5:14-cv-00240-F, Doc. 17-1.
[28] No. 5:18-cv-00188-FL, Doc. 1, complaint ¶ 3, Doc. 16, amended complaint ¶ 2.
[29] No. 5:14-cv-00240-F, Doc. 3-2, state court complaint ¶ 3.

Construction/FBG, LLC[30] and Corvias Military Construction, LLC.[31]   At all relevant times, Corvias Construction was providing housing and other services for military servicemen at Fort Bragg, North Carolina.  Corvias Construction's predecessor, Picerne Military Construction, was organized as a Delaware limited liability company on June 3, 2005.[32]

13.    Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Bragg, as well as the conduct and acts alleged herein.  During the pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts and omissions, rising to a level so as to have joint and several liability in this matter due to its direct material involvement.

14.    Defendants are not persons or entities acting under a federal officer, nor are Defendants insulated by any sovereign immunity, governmental immunity or government contractor defense herein nor any federal enclave defense.

## III.    JURISDICTION AND VENUE

15.    This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as it is an action for damages that exceed $75,000, exclusive of interest and costs and the Plaintiffs reside in a different State than the Defendants.

16.    This Court has personal jurisdiction over Defendants because of their contacts with North Carolina, the fact that they build, own and manage thousands[33] of military houses at Fort Bragg, and the fact that they derive substantial revenue from military housing in North Carolina.

---

[30] No. 5:14-cv-00240-F, Doc. 63 pp. 2-3.
[31] Certificate of Merger, filed with the North Carolina Secretary of State, Corporations Division, SOSID: 1365103, C2017 065 01680, March 10, 2017.
[32] Certificate of Merger, filed with the North Carolina Secretary of State, Corporations Division, SOSID: 1154047, C2010 1590 0299, June 11, 2010.
[33] According to its press releases, at Fort Bragg, Corvias Property Management is responsible for nearly 6,500 homes across 11 communities.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## V.     FACTUAL ALLEGATIONS

### a.     The MHPI Program.

18.     In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871 *et seq.* (1996).  The MHPI provided military service branches with alternative authorities for construction, renovation and management of military housing for including for families.  Under these authorities, the services could leverage appropriated housing construction funds and government-owned assets to attract private capital and private developers in effort to improve the quality of life for soldiers and their families.

19.     Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects."  S. Rep. No. 104-112 (1995).  The MHPI provided the Department of Defense ("DoD") with 12 alternative authorities or tools to initiate housing projects which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances (the "Basic Allowance for Housing" or "BAH"), investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

20.     There are about 80 privatized projects encompassing more than 204,000 housing units located on more than 150 installations.[34]  The DoD considers these houses to be private

---

[34] Esper, service secretaries talk privatized housing reform, U.S. Army, Oct. 9, 2019.

housing.  Servicemembers who are housed on base are paid the prevailing BAH rate for their duty location and required to reimburse the management company of their rental home the full amount of their BAH.  This creates continuous revenue flow for the life of the management contract and, conceptually, requires little additional funding from the government.

21.     Privatizing U.S. military housing was supposed to protect servicemembers' families.  The military knew hazards lurked in its housing, and private companies knew that when they took over.  In 2005, the U.S. Army released an environmental study that said 75% of its 90,000 homes nationwide did not meet its own standard of quality or safety.[35]

22.     Twenty years after privatization, in 2016, a DoD Inspector General Report found that poor maintenance and oversight left service families vulnerable to "pervasive" health and safety hazards.  On October 14, 2016, the DoD Office of Inspector General issued a report to "summarize and analyze previous DoD Office of Inspector General (DoD OIG) health and safety inspections of DoD-occupied facilities and military housing."[36]  One "objective was to identify common issues and broader findings."

23.     The 2016 OIG Report findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of adequate preventative maintenance and inspections being performed at the installations. As a

---

[35] Haley Britzky, What we're reading: Kids at risk of lead poisoning on U.S. military bases, Axios, Aug 16, 2018. *See also* Reuters Special Report, Joshua Schneyer and Andrea Januta, Children poisoned by lead on U.S. Army bases as hazards go ignored, Aug. 16, 2018 ("The military knew hazards lurked in its housing. In 2005, the Army released an environmental study that said 75 percent of its 90,000 homes nationwide didn't meet its own standards of quality or safety. Of Benning, it said: 'As homes deteriorate, the risk of children's being exposed to hazardous materials … would increase.'").  The underlying 2005 report is, US Army Corps of Engineers Mobile District, Final Environmental Assessment for the Residential Communities Initiative at Fort Benning, Georgia, Executive Summary, June 2005, ES-1 ("The Army operates and maintains approximately 90,000 family housing units at its installations throughout the United States. More than 75 percent of the units do not meet current Army housing standards.").

[36] Summary Report, Inspections of DoD Facilities and Military Housing and Audits of Base Operations and Support Services Contracts, Department of Defense Office of Inspector General, DODIG-2017-004, October 14, 2016 ("2016 OIG Report").

result, DoD personnel and military families were exposed to health and safety hazards at installations around the world."[37]

24.    The 2016 OIG Report further found: "These systemic problems resulted in increased health and safety risks to service members."[38]  The 2016 OIG Report summarized prior OIG reports and their findings of "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."[39]

25.    Beginning in 2018, Reuters published[40] a series of award-winning[41] news articles detailing substandard living conditions at U.S. military bases operated by Corvias and other large companies, including lead exposure, vermin infestation, mold and other contaminants.  The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

26.    In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.[42]

---

[37] Id.
[38] Id.
[39] 2016 OIG Report, findings, p. 6.  It noted that "[i]n addition to the critical mold-related deficiencies in Report No. DODIG-2014-121, we also documented mold-related problems in all three of the reports that included environmental health and safety inspections (Report Nos. DODIG-2015-013, DODIG-2015-162, and DODIG-2015-181)."  Id.  Of those reports, DODIG-2015-181, Continental United States Military Housing Inspections – Southeast, surveyed three installations in the Southeastern region of the continental United States—Patrick Air Force Base (AFB), Naval Station (NS) Mayport, and Fort Gordon.  DODIG-2015-162, Continental United States Military Housing Inspections – National Capital Region, surveyed two installations in the United States National Capital Region—Fort Belvoir and Joint Base Anacostia-Bolling.
[40] https://www.reuters.com/investigates/section/usa-military/.
[41] 2019 Hillman award for web journalism (http://www.hillmanfoundation.org/hillman-prizes/2019-hillman-prize-web-journalism); 2019 National Press Club award for consumer journalism in the newspaper category (https://www.press.org/newsroom/annapolis-capital-gazette-baltimore-sun-win-breaking-news-award-national-press-club);
[42] Deborah Nelson, M.B. Pell, Congress watchdog begins inquiry into housing hazards at U.S. military bases, Nov. 14, 2018.

27.     On December 3, 2018, a hearing was held before the United States Senate's Committee on Armed Services.[43]   At the onset of the hearing, Senator James M. Inhofe from Oklahoma stated as follows:

> Almost a year ago, I first heard from military families about the dismal conditions they faced.  Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base.  And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no.  It is elsewhere in Oklahoma.  But then it is also all the way around the country.  And so that was the background of how this all started.
>
> We have come to learn that it is a problem nationwide. It is a national crisis of proportions we have not seen since the scandal at Walter Reed about a decade ago.

28.     During the same hearing, Elizabeth A. Field, Director, Defense and Management, Government Accountability Office, stated in written testimony, "We analyzed over 8 million work order records from all 14 private partners and all 79 projects…. we found anomalies in the data provided by all 14 private partners such as duplicate work orders and work orders with completion dates prior to when they were submitted."[44]

29.     Also in December 2019, Ms. Field was quoted as stating, "The problems I detail are significant not just because they tell us that DOD's statement that the program has been

---

[43] Committee on Armed Services, United States Senate, Hearing to Receive Testimony on Accountability to Provide Safe Military Housing and Other Building Infrastructure to Servicemembers and Their Families, March 7, 2019, Washington, D.C.  Senator Inhofe's opening statement runs from tr. pp. 2-6.

[44] United States Government Accountability Office, Report to Congressional Addressees, DOD Needs to Strengthen Oversight and Clarify Its Role in the Management of Privatized Housing, March 2020, GAO-20-281, p. 3.

successful overall may not be fully accurate, but because the Department has been using these metrics to reward and incentivize the private partners."[45]

30.    Private military housing companies, including Defendants in this case, manipulated service and repair records to the detriment of residents to drive up profits, including "incentive fees," that could be collected as part of its contract with the government.

31.    Senator Elizabeth Warren opened her own investigation of the Military Housing Privatization Initiative and five companies, including Defendants in this case, on February 6, 2019.[46] She submitted her written report dated April 30, 2019, which contains four conclusions:

    A.    "Conclusion One: The private military housing providers have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds."

    B.    "Conclusion Two: The private military housing providers have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality."

    C.    "Conclusion Three: Private housing providers are making large profits while taking minimal investment risks."

    D.    "Conclusion Four: The companies and their subsidiaries are receiving sizeable incentive fees even when they face substantial quality control challenges."[47]

**b.**    **Fort Bragg and Corvias.**

32.    Fort Bragg is the most populated military base in the United States and includes nearly 6,500 family homes. Beginning in or about 2001, Mr. Picerne worked to position Corvias

---

[45] Daniel Wilson, DOD's Private Housing Metrics Misleading, GAO Official Says, Law360, Dec. 3, 2019.
[46] Letter dated April 30, 2019 from Senator Warren to Secretary Esper et al., regarding MHPI (noting "I opened this investigation on February 6, 2019, amid reports of substandard on-base housing that was having a significant effect on morale and, in some cases, causing severe health problems for military families").
[47] *Id.*

to bid on the project, including by contacting members of the Senate Armed Services Committee which oversees military spending.[48]

33.     In 2001, Picerne Military Housing won the bid to develop a pilot installation at Fort Meade, Maryland, under the MHPI program.[49]

34.     According to Reuters in December 2018, Mr. Picerne's businesses, including Defendants, had spent $2.8 million on lobbying, mostly of Congress and the Defense Department, on issues related to military housing or Defendants' contracts.  Mr. Picerne has given at least another $500,000.00 in political contributions.

35.     Corvias won the Fort Bragg contract and, to accomplish its goals related to the development and management of military housing, the United States of America ("United States"), by The Secretary of the Army ("Secretary"), entered into a Ground Lease with Defendant Bragg Communities on August 1, 2003 ("Ground Lease").  At that time, the Army transferred ownership and operation of 4,746 homes to Picerne Military Housing to form Bragg Communities.[50]

36.     As noted, Congress designed the MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities as a *quid pro quo* for their provision of housing and related services to military personnel. 141 Cong. Rec. S18853 (MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel").  By operation of the Ground Lease and under the authority of 10 U.S.C. § 2878, the Secretary leased property to Bragg Communities to act as the owner of

---

[48] Joshua Schneyer, Andrea Januta, Special Report: As their landlord profits, soldiers battle unsafe Army homes, Reuters, Dec. 27, 2018.
[49] Matthew C. Godfrey, Paul Sadin, Dawn D. Vogel, Joshua Pollarine, Nicolai Kryloff, Privatizing Military Family Housing, A History of the U.S. Army's Residential Communities Initiative, 1995-2010, prepared for the Office of the Assistant Secretary of the Army, Installations, Energy & Environment, GPO, 2012, p. 166 (available as free e-book) ("Godfrey 2012").
[50] Godfrey 2012, p. 316.

- 13 -

residential homes, including the residential homes leased by Plaintiffs, for a term of 50 years, for purposes of the design, management rehabilitation, renovation, maintenance of residential communities and related ancillary facilities at Fort Bragg,.

37.     Under the circumstances, military personnel, including Plaintiffs, were intended third party beneficiaries[51] of the Ground Lease.  The MHPI and the Ground Lease were created for the express purpose of improving military housing for servicemen and women like the Plaintiffs and their families.

38.     By entering into a contract with The United States of America, Defendants, beginning with Bragg Communities, but also embracing all Defendants to the extent they operated as a single integrated operation,[52] placed themselves in such a relation with Plaintiffs that the law imposed an obligation upon Defendants to act in such a way that Plaintiffs would not be injured.

39.     Under the Ground Lease, Bragg Communities is the "Lessee," and Bragg-Picerne Partners is the "managing member" of Bragg Communities.  Any reference to "Lessee" includes any of its sublessees, assignees, transferees, successors and their duly authorized representatives. A Memorandum of Ground Lease was recorded with the Cumberland County Register of Deeds on August 1, 2003.[53]

40.     In an Affidavit dated July 12, 2016,[54] Ron Phillips ("Phillips"), former Regional Vice President of Construction for Corvias Military Living, averred that "[t]he United States Army

---

[51] "To establish a claim based on the third party beneficiary contract doctrine, a complaint's allegations must show: (1) the existence of a contract between two other persons; (2) that the contract was valid and enforceable; and (3) that the contract was entered into for his direct, and not incidental, benefit." *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 702-03 (2009) (quoting *Leasing Corp. v. Miller*, 45 N.C. App. 400, 405-06, 263 S.E.2d 313, 317 (emphasis added) (citation omitted), *cert. denied*, 300 N.C. 374, 267 S.E.2d 685 (1980)).  "In determining whether the parties intended to benefit a third party, we must consider the surrounding circumstances as well as the language of the contract." 194 N.C. App. at 703.
[52] Unlike many of the Army's partners, Picerne is a fully integrated company, acting as owner, developer, builder, and property manager for each of the projects it overseas."  Godfrey 2012, p. 166.
[53] Cumberland County Register of Deeds, Book 6209, Page 0824, Aug. 1, 2003.
[54] No. 5:14-cv-00240-F, Doc. 63-1.

owns and operates Fort Bragg. Pursuant to various agreements and a fifty-year ground lease with the Army, Bragg Communities, LLC is the owner of the Fort Bragg Privatized Family Housing Project (the 'Project')." Phillips stated further, "[v]arious Corvias Military Living, LLC affiliates are involved in the development, construction and property management of the Project. For instance, Corvias Military Construction LLC, was engaged by Bragg Communities, LLC to manage the construction and renovation of the privatized family housing at the Project. Corvias Military Construction, LLC is a wholly-owned subsidiary of Corvias Military Living, LLC."

41.    On March 2, 2016, Phillips gave testimony[55] as the corporate designee for multiple Corvias entities joining to sue as plaintiffs including Bragg Communities, Bragg-Picerne Partners, Corvias Military Living and Corvias Construction, yet also testified he was only employed by one of them. When asked if he was still prepared to speak on behalf of all corporations he said, "Yeah. I mean, it's kind of all one flowing organization." Phillips says that all the corporations are what would be known as the Corvias "Group."

42.    Bragg Communities is required to keep the leased property, otherwise known as the "Project," in "good order and in a decent, safe, and sanitary condition"[56] at its sole expense. Bragg Communities must ensure professional management and maintenance of the housing consistent with the standard of a market rate residential rental development in the Fayetteville area.

43.    The Ground Lease mandates that homes, garages, carports, storage sheds, grounds and other facilities, are to be maintained to a standard that prevents deterioration beyond that which

---

[55] No. 5:14-cv-00240-F, Doc. 63-7.
[56] Army Regulation 210–50, Installations Housing Management, Oct. 3, 2005, p. 32, § 4-4, Adequacy standards for Government–controlled permanent party UPH ("The housing must provide a decent, safe, sanitary, and habitable accommodation in good repair."). *See also* § 4-9 ("Continued retention is contingent upon meeting the following conditions: … b. The housing is safe, decent, and sanitary so as to be acceptable for occupancy pending revitalization.").

results from fair wear and tear. That includes making sure that all housing facilities are free of missing components, or defects, which would affect the safety, appearance, or habitability.

44. The Defendants, pursuant to the Ground Lease, obtained control over the renovation, demolition, construction and maintenance of the military housing for Fort Bragg, subject to requirements and duties imposed upon it by the Ground Lease and related documents.

45. The Ground Lease and related documents required the Defendants to observe and comply, at their sole cost and expense, with the provisions of all federal, state and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements applicable to the premises and the residential units. As described by Elizabeth Field, Director, Defense and Management, Government Accountability Office, in testimony to Congress in December 2019, "[t]he companies … are required under all of the projects to comply with all federal, State, and local environmental health and safety codes. So that requirement that is in all of the contracts."[57]

46. Defendants were required to operate the housing at Fort Bragg in good order and in a clean, safe condition at its expense, as a first-class residential rental development for tenants. Defendants were bound by the terms of the Ground Lease and responsible for the design, financing, demolition, renovation, ownership, management, operation and maintenance of existing and new housing units.

47. Under the Ground Lease, Corvias claimed to be committed to professional management and maintenance of the neighborhoods consistent with the standards of a market rate residential rental development in the surrounding area. This was to include maintenance and repair in accordance with military, federal, state and local codes to ensure that all of the houses were in

---

[57] Committee on Armed Services, United States Senate, Hearing to Receive Testimony from the Government Accountability Office on Privatized Housing Findings to Include Responses from the Military Services on Ongoing Reports of Substandard Housing Conditions and Services, Dec. 3, 2019, Washington, D.C.; testimony of Elizabeth Field, Director, Defense and Management, Government Accountability Office, at 89:7-10.

a condition at all times reasonably acceptable, including, but not limited to, cleaning, painting, decorating, plumbing, electrical, HVAC, appliances, carpentry, grounds-care, and such other maintenance and repair work as may be necessary.

48. The Department of the Army adopted standards that apply to the construction, renovation and condition of privatized housing. Compliance with each of the standards is mandatory unless the Assistant Secretary of the Army, Installations and Housing Office approves a waiver in writing, on a case-by-case basis.

49. The purposes of the MHPI was "to obtain private sector capital and expertise to operate, manage, maintain, improve, renovate, and construct military housing (for both families and unaccompanied personnel) on or near military installations in the United States." The Army's housing privatization program, known as the RCI program, was "dedicated to building quality residential communities for soldiers and their families."[58] As such, Defendants were fairly obligated, as the private sector partners, to provide adequate and reasonable service to "operate, manage, maintain, improve, renovate, and construct" the military housing; they had a duty to be fair and nondeceptive in their representations made to servicemember prospective tenants; and they had a duty to provide "quality" communities.

50. Publications including Department of the Army Pamphlet 420-1-1, Facilities Engineering, Housing Management, from 2009, identify standards intended to maintain housing real property to prevent deterioration beyond that which results from normal wear and tear.[59] Table 2-11[60] requires that exterior walls be structurally sound, weather tight and in a good state of repair. Roofing is required to be weathertight and free of corrosion and abnormal deterioration of

---

[58] Dep't of the Army Pamphlet, 210–50, Installations Housing Management, Oct. 3, 2005, § 14-9.
[59] Dep't of the Army Pamphlet, 420-1-1, Facilities Engineering, Housing Management, April 2, 2009, § 2-29, p. 49.
[60] Id., p. 50.

individual components, and replacements for missing pieces preserve the original whole condition of the roof system. Items that pierce the roof including chimneys, vent stacks, roof ventilators, and other items must function as designed.  Flashing must prevent leaks as originally intended.

51.     The 2009 Army Pamphlet § 2-29, Table 2-12, also applicable to Fort Bragg, requires interior walls be free of damage, deterioration, cracks, or defective materials.  Subflooring and related structural members must be safe and usable.  Deteriorated subflooring must be repaired or replaced to retain the original who condition of the floor.  Interior trim must be smooth, free of chipped and peeling paint.[61]

52.     The Ground Lease requires Defendants to manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin ("PWTB") 420-70-2.[62]

53.     Exhibit "F" of the Ground Lease is the "Final Environmental Baseline Survey for the Army Residential Communities Initiative Properties at Fort Bragg, North Carolina" ("EBS"). As required by DoD policy, an EBS must be prepared before any real property can be sold, leased, transferred, or acquired.  The purpose of the EBS is to establish a baseline of the environmental condition of the property.  It serves as a basis for identifying areas of real property that may be contaminated.

54.     The EBS was completed and published in March 2003, then provided to Defendants both prior to and contemporaneously with the signing of the Ground Lease dated August 1, 2003.

55.     The EBS incorporates a lead-based paint survey ("Lead Survey") conducted in 675 housing units constructed prior to 1978 within Fort Bragg.  The Lead Survey, prepared by Ballard, McCredie, Elliott & Associates in 1993, includes all housing communities within Fort Bragg and

---

[61] *Id*., pp. 49-51.
[62] Available at https://www.wbdg.org/FFC/ARMYCOE/PWTB/pwtb_420_70_2.pdf.

indicates that LBP *is present* in the housing units constructed prior to 1978. Additionally, 755 soil samples were collected at 362 housing units throughout all housing communities in Fort Bragg. Analysis using x-ray fluorescence ("XRF") technology indicated lead concentrations in the soil surrounding the housing units in all housing communities exceeding regulations set by the U.S. Environmental Protection Agency ("EPA").

56.     According to EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million (ppm) in high contact areas for children or 1,200 ppm of bare soil in the rest of the yard.[63] *In 1993, the lead in soil analysis identified lead in the soil at concentrations as high as 83,000 ppm.*

57.     The EBS recommends further investigation to accurately determine the concentrations of lead in the soil. The EBS was not disclosed to Plaintiffs at the time they signed residential leases.

58.     According to the EBS, surveys conducted in 1993 revealed that lead based paint existed throughout the property and building components that routinely tested positive for lead-based paint included door frames, windowsills, window jambs, and baseboards.

59.     Defendants possessed records and information, including nonpublic records or records not readily accessible by the public, and including the EBS and Lead Survey, which identified concerning lead concentrations in the soil surrounding all housing communities. Defendants knew that lead based paint was present in housing units throughout Fort Bragg.

60.     Despite having information of the potential threat posed by lead, Defendants did not disclose the EBS and Lead Survey to all tenants. Defendants routinely omitted information concerning lead-based paint, or lead-based paint hazards, from residential lease contracts and

---

[63] https://nchh.org/information-and-evidence/learn-about-healthy-housing/health-hazards-prevention-and-solutions/lead.

habitually failed to disclose information such as the location of the lead-based paint and/or lead based paint hazards, and the condition of the painted surfaces.

61.     By operation of the Ground Lease and the PWTB, Defendants must meet the standards of the American Society for Testing and Materials ("ASTM").  ASTM Subcommittee EO6.23, Abatement of Lead Hazards in Buildings, "was established by the U.S. Department of Housing and Urban Development (HUD) in 1991 to develop consensus guidelines for abating and mitigating lead hazards in and around buildings. The sub-committee has developed and continues to develop guidelines and standards to be used in dealing with lead hazards associated with paint, dust, airborne particulates, and soil."[64]

62.     According to PWTB Section 2-1, the installation lead hazard management program must "Comply with Federal, state, and local lead-based paint (LBP) regulations.  Army policy is to follow the more stringent regulation." Section 2-2 states, "It is an Army requirement to provide a lead hazard-free living and working environment for soldiers and their families."[65]

63.     PWTB Section 2-3 establishes "Medical policy guidance" and states, "The Childhood Lead Poisoning Prevention (CLLP) Program on each installation consists of a multi-disciplinary core of experts who develop an overall program of lead risk reduction. Program elements include a child blood screening program; lead exposure risk questionnaires; clinically indicated screening; elevated blood lead (EBL) case management; and outreach, education, and training."[66]

64.     The PWTB requires implementation of an "Installation Lead Hazard Management Plan" including a detailed process for identification and management of lead hazards in paint, dust,

---

[64] PWTB 420-70-2, p. 2-2.
[65] *Id.* at p. 2-1.
[66] *Id.* at p. 2-2.

and soil.  The Program is to include a lead hazard management team which understands key terms

and regulatory requirements of lead hazard management.  The team is required to develop an

installation lead hazard management plan.  Elements of the plan,[67] maintained by the appropriate

lead hazard management team member, include:

A.    Identification and prioritization of target housing and child-occupied facilities.

B.    Summaries of construction and maintenance histories taken from real property records, contract documents, and other local sources.

C.    Summaries of child and worker blood lead level screening and testing data.

D.    Identification of similar groupings of facilities for risk assessment and interim controls.

E.    Results of previous paint inspections.

F.    Results of risk assessments identifying lead hazards.

G.    Recommended interim controls and abatement actions based on results of risk assessments.

H.    Records of actions taken for children with EBLs (elevated blood lead).

I.    Records of training and certification of personnel involved in LBP (lead based paint) activities.

J.    Medical surveillance records of personnel involved in LBP activities.

K.    Results of clearance and on-going monitoring inspections showing recommended changes to interim control procedures and abatement plans.

L.    Abatement project lists, including Whole-Neighborhood Revitalization and other major repair projects.

M.    Records of solid waste characterization and disposal actions.

N.    Copies of contract documents/reports specifically cited in the lead management plan.

O.    Identification of sources of funding and planning, programming, budgeting, and execution plans.

---

[67] *Id*. at pp. 3-3 to 3-4.

- 21 -

P.    Lists of projects submitted to higher headquarters through the EPR (Environmental Program Requirement) Report.

65.    Per the PWTB, The Lead Hazard Management Plan called for the development of a lead hazard public awareness program.[68]  Among other requirements, occupants are to be notified at the time of assignment to quarters concerning the known presence of lead-based paint and/or lead-based paint hazards, and precautions they can take to protect children.   Additionally, occupants are to be notified of the results of risk assessments and actions planned to implement interim controls or abatement.   Occupants with young children must receive information on protecting children from lead poisoning.   "The importance of wet mopping or wet wiping with detergent to control lead dust levels and of washing children's hands must be stressed."   Medical screening of all military family members under the age of six years was to be conducted in accordance with the procedures and guidelines set forth in Memorandum, Office of the Surgeon General, DASG-PSG, subject: Childhood Lead Poisoning Prevention, dated 26 May 1993. Medical surveillance programs for workers exposed to lead were outlined in:

A.    Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.1025, Lead Standard for Non-Construction Activities Such as Routine Maintenance.

B.    OSHA, 29 CFR Part 1926.62, Lead Exposure in Construction; Interim Final Rule.

C.    HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.[69]

66.    According to "Step 8" of the plan, Defendants must perform risk assessments and EBL investigations of target housing and child-occupied facilities.   "The Army has adopted, as the minimum standard of care, the procedures for performance of EBL investigations found in the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing, Chapter

---

[68] *Id.* at pp. 3-1, 3-5.
[69] *Id.* at pp. 3-5, 3-6.

16." The elements of a risk assessment include "Gathering of information regarding the age and maintenance history of the facility, the likelihood of occupancy by children under age 6, and known findings of EBL levels in children."[70]

67.     Ongoing monitoring of lead-based paint was required in all target housing and child-occupied facilities where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition.[71]   Ongoing monitoring was to include a report of findings and recommendations.  The Army, and by operation of the 50-Year Lease and PWTB, adopted, as the minimum standard of care, the procedures for performance of ongoing monitoring in HUD Guidelines, Chapter 6.

68.     Per the Plan, between occupancy, target housing should be re-inspected to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces.

69.     Accordingly, by operation of the 50-Year Lease and PWTB, Defendants are bound by the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.

70.     Plaintiffs are informed and believe that prior to taking possession of the housing properties per the 50-Year Lease Agreement, Defendants were provided an EBS from the government containing all available information concerning known lead-based paint and/or lead based paint hazards, the location of the hazards, and the condition of painted surfaces.  Defendants acknowledge receipt of the EBS when they executed the 50-Year Ground Lease.

71.     Defendants agreed they would not permit occupancy or use of any buildings, including those leased by Plaintiffs, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead based paint hazards.  Per operation of

---

[70] *Id.* at pp. 3-8.
[71] *Id.* at pp. 3-13.

- 23 -

the 50-Year Ground Lease, the PWTB and HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing are applicable.

72.     The ROA is a contract between the servicemember as "resident" and Bragg Communities (the Corvias entity that owns the property), with Corvias Management-Army signing the agreement as Bragg Communities' agent and being designated as the property manager.

73.     Rent is the full basic allowance of housing, or BAH, which is deposited directly into one or more of Defendants' accounts.  There is no ability to negotiate the price of housing, or the ROA terms.  Per the Corvias website: "Rather than receiving the BAH into their accounts and then making monthly rental payments, service members have signed a Resident Occupancy Agreement, or lease.  The signed ROA gives the government permission to start the rent allotment, which equals the Soldier's BAH entitlement for his or her rank and should reflect any BAH increases or decreases that occur…."[72] "The BAH money is earmarked for rent. If the Soldier spends it, he or she will be responsible for paying rent until the problem is corrected."

74.     For a servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible.  This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training.   And for servicemembers relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

75.     To this same point, during the hearing on December 3, 2019, before the United States Senate's Committee on Armed Services, Senator Tim Kaine remarked:[73]

---

[72] https://bragg.corviasmilitaryliving.com/relocating/ready-to-move/find-your-bah.
[73] Committee on Armed Services, United States Senate, Hearing to Receive Testimony from the Government Accountability Office on Privatized Housing Findings to Include Responses from the Military Services on Ongoing Reports of Substandard Housing Conditions and Services, December 3, 2019, Washington, D.C., p. 50.

> But they treat military tenants like they are
> captives, like it is a captive audience. People who move
> from across the country to a place where they do not know
> anyone, where they do not know anything about the rental
> market, where they are trying to find new schools and get
> accustomed to everything else -- there is a natural
> tendency to want to live on base. And the occupancy rates
> will be high because of that tendency. And so these
> companies who would compete hard and try to produce a high
> quality product in another business unit of the identical
> company treat these folks as if they are captives and that
> they do not have to treat them in the same way that they
> would treat private tenants. And I find that outrageous.

76.     The ROAs apply the laws of the State in which the Unit is located to the maximum

extent that the applicable state law applies to leased premises and the court of such State have

jurisdiction over the homes, as well as any applicable Federal Laws, any applicable military rules,

regulations and/or guidelines, and the Resident Responsibility Guide, all of which are incorporated

by reference.[74]

77.     Defendants' compliance with the Army's standards for housing at RCI Projects is

mandatory. According to the Army's standards, roofs must be in good condition with no visible

signs of leakage and exterior finishes must have no significant signs of distress. The Army's

standards require that no lead-based paint can be exposed on interior surfaces.

78.     N.C.G.S. § 42-42(a) requires Defendants to comply with the current applicable

building and housing codes and make all repairs and do whatever is necessary to put and keep the

premises in a fit and habitable condition. Additionally, within a reasonable period of time based

---

[74] Form lease, § 12. The "Resident Responsibility Guide" is found online at
http://corviasmilitaryliving.com/global_content/resident_responsibilities/Fort_Bragg_RRG.pdf (accessed Aug. 31,
2020).

upon the severity of the condition, Defendants must repair or remedy any imminently dangerous condition on the premises after acquiring actual knowledge or receiving notice of the condition. Imminently dangerous conditions include unsafe flooring or steps, and unsafe ceilings or roofs, as well as mold.

79.     In accordance with N.C.G.S. Chapter 160A, Article 19, Part 6, the Cumberland County Code[75] establishes minimum standards of fitness for dwellings and environs for the initial and continued occupancy of all places of abode in the Cumberland County, where Fort Bragg family housing is located. Division 2, § 4-71, requires that dwelling units must comply with all minimum standards of fitness for human habitation. Floors with broken, overloaded, decayed or excessively sagging sills, beams, girders and joists are prohibited. Floors must be in sound condition and good repair. All load-bearing walls, exterior or interior, shall not be substantially bowed or out-of-plumb and shall be structurally sound. Roofs shall be in sound condition and capable of supporting the load intended, and there shall be no seriously rotted, broken, or improperly supported ends. Each dwelling unit that does not comply with the requirements of Division 2 of the Code shall be deemed substandard.

80.     Corvias Management-Army is responsible for managing Fort Bragg family housing and for providing notification to residents under ROAs on behalf of Bragg Communities and any other Corvias entities. All notifications, statements, and representations made by Corvias Management-Army to tenants were made under and within the course and scope of Corvias Management-Army's agency with Bragg Communities.

81.     Corvias Management-Army drafts and controls the Resident Responsibility Guide provided to tenants. Corvias Management-Army, along with the other Defendants to the extent

_____

[75] https://library.municode.com/nc/cumberland_county/codes/code_of_ordinances.

involved in maintaining and Corvias website content, and staffing the base office premises, controls and directs the representations to military families living in Fort Bragg's military housing regarding their units and the representations made to prospective residents.

82.     When the Corvias entities took control of housing at Fort Bragg, they had actual and constructive notice and knowledge of potentially harmful housing defects as identified in the 50-Year Lease Agreement and EBS.

83.     Since taking control of housing at Fort Bragg, Defendants have received thousands of complaints and repair requests, evidencing serious defects which have existed throughout the housing at Fort Bragg.  Defendants have had actual notice of the unfit and uninhabitable state of leased premises but have failed to repair them.  In addition, Defendants have had notice of their own unreasonable and inadequate maintenance, repair and service practices, including via the computer data, metrics, and logs they maintain regarding that sector of their integrated operation.

84.     Defendants, including but not limited to Corvias Management-Army, during the last four years made representations to soldiers in connection with the homes, including that they were structurally sound, had no potential health or safety hazards to residents, and were compatible with contemporary standards of livability.  Defendants further has advertised that renovations are compliant with current housing and building codes.

85.     On its website, http://bragg.corviasmilitaryliving.com/, Corvias compares Fort Bragg military housing to an "upscale"[76] residential community, and advertises "upgrades and new home construction," "dedicated professional management and maintenance teams," a "24-hour responsive maintenance team," and multiple amenities akin to a civilian country club.

---

[76] See website, describing "many amenities commonly found in upscale residential neighborhoods."  At https://bragg.corviasmilitaryliving.com/how-to-apply-mobile.

86.     On February 13, 2019, Mr. Picerne, Founder and Chief Executive Officer of the Corvias Group, in written testimony provided to the Joint Subcommittee on Personnel & Readiness and Management Support, United States Senate Committee on Armed Forces, apologized that "[a]ny let down of any of our residents is unacceptable. And we are making every effort to fix it." He advised that "[w]e're returning to the "gold standard" level of resident care that defined our company, from the start."[77]

87.     In his February 13, 2019 testimony, Mr. Picerne described "steps to do a better job at resident service" being taken, and "a number of structural changes." Plaintiffs allege that these service and structural changes should have been implemented years ago, and that if Corvias had acted earlier, Plaintiffs would not have been injured and had their use and enjoyment of their rented home substantially and unreasonably impaired.

88.     On October 7, 2019, Heather Fuller, the operations director for Corvias at Fort Bragg, insisted to the Fayetteville Observer that major renovations were planned "before residents began raising concerns about mold, lead paint and possible carbon monoxide issues in homes last year and this year."[78] On information and belief, any contention by Defendants that they had already intended to make the recently announced capital expenditures and structural reforms prior to when Congressional hearings occurred in 2018 and 2019 is false.

89.     In December 2018, Kelly Douglas, a Corvias Spokeswoman, told Reuters, "Our core mission at Corvias is clear: Put service members and their families first. That means providing a safe, comfortable home to those in the military who choose our housing."[79]

---

[77] Statement by John G. Picerne, Founder & Chief Executive Officer, Corvias Group, Before the Joint Subcommittee on Personnel & Readiness and Management Support, United States Senate, Committee on Armed Services, Feb. 13, 2019, https://www.armed-services.senate.gov/imo/media/doc/Picerne_02-13-19.pdf.
[78] https://www.fayobserver.com/news/20191007/corvias-starts-fort-bragg-housing-renovation.
[79] Joshua Schneyer and Andrea Januta, As U.S. soldiers battle landlord, confidential records shine light on his lucrative business, Reuters, Dec. 27, 2018.

Defendants' representations stand in stark contrast to the actual housing conditions, and repair and maintenance practices.

      c.    **The Thomas Plaintiffs.**

90.    Plaintiff Rachel Thomas resides at the home address of 3329 Park Avenue, Brookfield IL 60513 with her husband, SSG Ezra Thomas, and their two sons, minor children E.T. and E.T., ages 11 and 8. SSG Thomas holds the rank of Staff Sergeant E-6. He has served in the U.S. Army for years. Today he is an Army Recruiter working in Melrose Park, Illinois.

91.    In January 2013, the Thomas family moved to Fort Bragg and into a Corvias home in the Hammond Hills community. They lived in that home until 2019.

92.    The Thomas family's residence at Fort Bragg was located at 128 East Luzon Drive.

93.    When the Thomas family moved into the home, their older son was very young, and Rachel was pregnant with their other son.

94.    Rachel's paramount concern was the health and safety and cleanliness of their immediate environment -- their home -- for her toddler, and, for her pregnancy and her soon-to-come newborn.

95.    In base housing there are a high proportion of families with babies or young children, especially in the enlisted ranks, like E-2 or E-6 in the case of SSG Thomas.

96.    Corvias is aware of the nature of its military family tenants. Corvias knows the types of families who live in these military homes – and that they are far more likely to have infants and young children, than other tenants in other projects.

97.     Corvias' knowledge is evident in Corvias' own advertising regarding its homes. There is a Corvias page on its website about "schools on post" with a photo of children.[80]   There is a "photo gallery" featuring numerous photos of young children.[81]

98.     The Hammond Hills section of the Corvias website touts the community as being ideal for families with children with its "charming ranch homes and recently constructed town homes."[82]   The Hammond Hills photo gallery has photos of families with children.[83]

99.     Corvias, as the company charged with overseeing this housing, had a duty to make sure the homes they offered for rent met adequate cleanliness, safety and healthiness standards to be appropriate to use for families with babies and young children.

100.     Corvias markets homes in Hammond Hills as coming with free included maintenance, "24-hour maintenance included."[84]

101.     The Thomas Plaintiffs' unit appeared to have been built many years ago, decades ago, and was a duplex.

102.     The complaints of the Thomas Plaintiffs at their Hammond Hills unit included:  1) bugs/insects; 2) lead paint; 3) electrical hazards; 4) window hazards; and 5) HVAC ducts / mold.

103.     Upon move-in, Rachel Thomas noted that the home and backyard were infested with box elder beetles.  There were dead bugs in the home.  This was not hygienic for a family with a toddler.

104.     The Thomas Plaintiffs learned of lead paint in the home.  Rachel went to the Corvias housing office and voiced her concerns.  She described that there were chips of paint that exposed

---

[80] https://bragg.corviasmilitaryliving.com/schools.
[81] https://bragg.corviasmilitaryliving.com/relocating/explore-our-community/photo-gallery.
[82] https://bragg.corviasmilitaryliving.com/residents/neighborhoods/hammond-hills.
[83] https://bragg.corviasmilitaryliving.com/residents/neighborhoods/hammond-hills/photo-gallery
[84] https://bragg.corviasmilitaryliving.com/node/486

the bare wood of the door frames and peeling and chipped paint throughout their home. Corvias neither offered to come out and confirm whether it was lead paint, nor offered to remedy the peeling areas. Rather, Corvias stated that it was nothing to worry about.

105. Rachel looked into whether her family could move out. But Corvias said there would be charges, penalties and/or move-out fees for them to break their lease. Rachel and Ezra could not afford to move out.

106. The family's oldest son has had learning disabilities. Their youngest son has had seizures. The Thomases are concerned that their sons' medical issues may be connected to the exposures at the Fort Bragg home.

107. Because of their concerns, the Thomas Plaintiffs had their children evaluated for lead poisoning through the army medical clinic, and at the Duke Children's Hospital.

108. Some of the Thomas' unit light switches crackled and popped when they tried to turn them on and off. Rachel had an outlet explode and it scorched the surrounding wall when she attempted to plug her laptop into the wall outlet. Rachel called Corvias and made several work orders to have them look at the light switches. However, when they came out, it was never fixed.

109. In addition, 12 of the home's 14 windows either did not open at all, or, they would not stay up and would slam shut like a guillotine. Rachel called Corvias to have them come out and fix the windows. Each time that Corvias came out, they would look at the windows and tell her that they would have to order parts, and then they would never return. Their windows never got fixed until after the February 2019 visit noted below.

110. This is what the clean inside of an HVAC duct looks like:



111.    This is what the inside of the HVAC duct area at the Thomas Plaintiffs' Hammond

Hills home at Fort Bragg looked like:



112.    It was Corvias, as the landlord, and as the listed "owner" of the house under the lease, who had the duty to maintain the HVAC air ductwork for the residential unit.

113.    When Mrs. Thomas to her shock saw these conditions existed in her HVAC unit ductwork, she told Corvias.  They said just to change the filter.

114.    Mrs. Thomas sought to contact politicians to help her.  She recalls emailing a Senator or Congressperson (possibly Senator Elizabeth Warren).  It appears the official's office contacted the Fort Bragg Garrison Commander.  Her husband's whole Chain of Command learned about it.  Fairly promptly after that, the Garrison Commander came to personally see their home.

115.    Within a fairly prompt period of time after that, the Assistant Secretary of the Army, Alex Beehler, came to visit with a group of governmental and military representatives on February 21, 2019. The Assistant Secretary witnessed the home.

116.    He then wrote a letter to the family, dated February 21, 2019, which states in part, "Based on my visit, I have a first-hand understanding of your housing related concerns and I want to personally apologize for the conditions with which you have been living."

117.    After that, the Army helped the family to get out of the home.

118.    Also, the Thomas family discovered that there was mold growing around the areas of the main air duct that fed the air into the home:

- 33 -



119.    After the housing inspector came out, all that Corvias did to remedy the mold problem was to paint it over.

120.    That was not the proper remedy for evidence of mold that was growing out of the main air duct that fed air into this home.

121.    The house inspector who inspected at the time that the family moved out noted that the attic had little to no insulation.  For the first time, the family understood the likely reason why it was a constant struggle to keep the house heated and air conditioned properly.

122.    While at the home, on one or more occasions, the family additionally paid excessive utility costs which, but for Corvias' breaches of its duties, the Plaintiffs would not have had to pay.

123.    Under the circumstances, the Thomas' facts reasonably give rise to a conclusion of the existence of an aggravating factor sufficient for punitive damages.

- 34 -

124.     Under the circumstances, the Thomas Plaintiffs suffered an unreasonable and substantial intrusion upon and impairment of their leasehold/occupancy property interest in the Unit located at East Luzon Drive, for which injury Defendants are liable for compensatory damages for private nuisance, including damages for discomfort, annoyance, aggravation, irritation and loss of use and enjoyment, and punitive damages.

125.     Under the circumstances, the Thomas Plaintiffs had a reasonable basis to have an objective, reasonable concern for the potential health effects on their children caused by adverse indoor air pollution and indoor air quality conditions, due to the fact that a significant increased risk exists for infants and young children as a cohort to have adverse health effects secondary to such environmental exposures.

### d.     **Other factual allegations.**

126.     Defendants systematically breached their contractual obligations including the 50-Year Lease Agreement and ROAs, and consistently violated the laws of North Carolina, applicable federal law, military rules, regulations and guidelines, and contractual obligations expressly or impliedly imposed by the ROA or the Resident Responsibility Guide.

127.     Defendants conspired to conceal potentially harmful environmental and structural housing defects from Plaintiffs, including the underlying lack of effective moisture and air barriers between exterior cladding and wall cavities *in all homes*.

128.     The ROAs fail to disclose to tenants that units are in violation of applicable laws and obligations.  While the Defendants have at their disposal detailed repair and maintenance histories of the units and communities, they do not make this information available to prospective or incoming tenants as it relates to the history of the unit before the new family moves in.

- 35 -

129.     When Plaintiffs questioned Defendants about conditions on the properties they leased at Fort Bragg, Defendants' representatives on more than one occasion actively sought to keep Plaintiffs from learning about any underlying safety hazards associated with those conditions by, among other things, misrepresenting the causes or nature of the conditions.

130.     During relevant times, reflecting a pattern and practice, Defendants instructed maintenance employees and outside vendors to make shoddy repairs to cut costs; directed maintenance workers and outside vendors to conceal defects and not disclose them to tenants; directed the same not to use words such as "mold;" and used terms of retention and payment for outside vendors which hindered them from engaging in a root cause analysis or providing effective service.

131.     During the pertinent times, Defendants have obtained revenue and income not only from amounts leftover from BAH payments after all operating costs and expenses are deducted, but also from those operating costs and expenses themselves, via Defendants' integrated corporate enterprise structure which allows it to direct service, property management, repair and maintenance work in many instances to Defendants' entities or affiliates.

132.     During the pertinent times, part of Defendants' revenues and profits were based on receipt of management fees which the Army could in theory reduce based on negative assessment of the Defendants' performance based on repair and maintenance metrics and scores on resident satisfaction surveys.  In that regard, Defendants maintained an intentionally misleading method of maintenance recordkeeping, and, employed or encouraged the use of resident surveys that were gamed to slate results toward the positive.   This conduct was unfair and deceptive.

133.     On December 27, 2018, Reuters news agency published one of a series of detailed, exhaustively sourced special reporting revealing abysmal living conditions at Fort Bragg and

- 36 -

elsewhere, shedding light on Corvias' lucrative government contracts, and otherwise tending to show that Defendants' uniform business practices and systems were inadequate, unreasonable, unfair and deceptive in their effect on the ordinary servicemember tenant and family. The article garnered significant national attention and led to Congressional scrutiny.

134. Despite these developments, Defendants continued to act improperly. Meanwhile, Defendants have reaped millions in payments, including "incentive fees," pursuant to their contracts with the government. Defendants received iron-clad assurances of profit while Plaintiffs lived in conditions analogous to those caused by a "slumlord."

135. Plaintiffs are informed and believe that Community Development and Management Plans and other records show that Defendants collected many millions of dollars in fees for construction, development and management of homes during the first decade of the 50-Year Lease. The fees are pure profit for Defendants to the extent that maintenance expenses are covered by BAH payments from Plaintiffs.

136. Defendants stand to earn millions more in equity returns from cash left over from rental revenues after project expenses, debt servicing and other deductions are accounted for. This economic setup provides Defendants with an additional financial incentive to limit spending for maintenance, repair and upkeep of military houses.

137. Defendants' failure to disclose, and effort to conceal, housing defects both reflected unfair and deceptive lease practices vis-à-vis servicemembers and violation of their obligations to the Department of the Army.

138. Plaintiffs would not have entered into the ROA, had Defendants disclosed material, truthful, accurate and complete information regarding the defects to the family housing being

offered, including, but not limited to, defective moisture and air barriers between exterior cladding and wall cavities, and defective repair and maintenance.

139. Defendants have failed to develop, construct, renovate, maintain, operate and manage the Fort Bragg residential housing project with a level of skill and care over the term of the 50-year Ground Lease commensurate with market rate projects located in the area of the project, or adequate to satisfying their obligations under the Ground Lease.

140. All below claims are brought timely. Any applicable statute of limitations either has not expired or was tolled by the filing of *Page v. Corvias*, No. 5:20-cv-00336-D (E.D.N.C.) (complaint filed on June 24, 2020; putative class of Bragg servicemember families for defective housing from Corvias; alleged *inter alia* same claims as herein).

### FIRST CLAIM FOR RELIEF
**RRAA; breach of warranty of habitability**

141. Plaintiffs re-allege the above paragraphs 1 to 140 as if fully set forth herein.

142. This claim is brought solely against Bragg Communities and Corvias Management.[85] Plaintiffs' ROA was subject to N.C.G.S. § 42-46.

143. During all relevant times, Bragg Communities was the unit owner and a contracting party pursuant to the ROA and subject to the coverage of the RRAA.

144. During all relevant times, Corvias Management was the property manager and a contracting party pursuant to the ROA, an agent of the owner, and/or otherwise was subject to the coverage of the RRAA.

145. During all relevant times, N.C.G.S. § 42-42(a)(1) required Defendants to comply with the current applicable building codes including, but not limited to, Cumberland County Code, Article IV, Minimum Housing Code.

---

[85] Order dated Sept. 13, 2021, Doc. 63, p. 14.

146.    N.C.G.S. § 42-42(a)(2) required Defendants to make all repairs and do whatever necessary to put and keep the premises in a fit and habitable condition.

147.    N.C.G.S. § 42-42(a)(8) required Defendants, within a reasonable period of time based upon the severity of the condition, to repair or remedy any imminently dangerous condition on the premises after acquiring actual knowledge or receiving notice. Imminently dangerous conditions include unsafe flooring, unsafe ceilings, and excessive standing water that contributes to mold.

148.    During the pertinent times, Defendants, under all the facts and circumstances, had sufficient actual knowledge of pervasive defects and dangerous conditions in the units comprising the Bragg community so as to be deemed to have been on notice for purposes of triggering any RRAA duties that had a notice prerequisite. Defendants received numerous complaints and repair requests, including those from Plaintiffs, which were sufficient to place Defendants on notice.

149.    Per N.C.G.S. § 42-42(b), Defendants are not released from their obligations by Plaintiffs' explicit or implicit acceptance of the landlord's failure to provide premises complying with N.C.G.S. § 42-42, whether done before the lease was made, when it was made, or after it was made.

150.    Defendants violated N.C.G.S. § 42-42 in the following particulars as to Plaintiffs:

   A.    By failing to make all repairs and do whatever necessary to put and keep the relevant home in fit and habitable condition;

   B.    By failing to repair or remedy imminently dangerous conditions within a reasonable period of time based on the severity of the conditions;

   C.    By breaching Cumberland County Code, Article IV, Minimum Housing Code, §§ 4-78 & 4-79, in one or more respects; and

- 39 -

D.    By leasing and allowing servicemember families to occupy dwellings in known violation of relevant provisions of the Cumberland County Code, Article IV, Minimum Housing Code, Division 2.

151.    Defendants had a duty to provide fit and habitable housing not only under the RRAA but under North Carolina common law.[86]

152.    Defendants warranted to Plaintiffs that the leased premises were in fit and habitable condition. Prior to leasing military houses to Plaintiffs, Defendants had actual knowledge that the leased premises had defective moisture barriers which resulting in pervasive mold, structural wood rot and other housing defects. Defendants had actual knowledge that the leased premises were not compliant with applicable law or standards.

153.    With regard to lead paint, prior to leasing military houses to Plaintiffs, Defendants had actual knowledge that the leased premises contained lead-based paint, but did not comply with federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB. Specifically, Defendants failed to develop and implement a lead hazard management plan including the requisite elements. Consequently, the leased premises were not compliant with N.C.G.S. § 42-42, the Cumberland County Code, and other law.

154.    The home leased by Plaintiffs had defective moisture barriers which causes pervasive mold, structural wood rot, and other conditions which threaten the health and safety of

---

[86] *See Jackson v. Housing Authority of High Point*, 73 N.C. App. 363, 372, 326 S.E.2d 295 (1985) ("We turn now to plaintiff's contentions that the trial court erroneously directed a verdict for defendant on the breach of implied warranty, breach of contract, and strict liability claims. We find merit in plaintiff's contention regarding the implied warranty of habitability claim. *Javins v. First National Realty Corp.*, 428 F. 2d 1071 (D.C. Cir.), *cert. denied*, 400 U.S. 925, 27 L.Ed. 2d 185, 91 S.Ct. 186 (1970), cited by plaintiff, stands for the proposition that a landlord impliedly warrants to his tenant that leased or rented residential premises are fit for human habitation, at least to the extent of being free from observable conditions that render the premises unsafe or unsanitary. *Javins* further requires that applicable housing codes be read into the housing contract or lease agreement and made part of the implied warranty…. Our Residential Rental Agreements Act, G.S. 42-38 *et seq.*, codifies the essential points in *Javins. See,* G.S. 42-42. Thus, to the extent that any implied warranty may be said to exist, it is co-extensive with the Residential Rental Agreements Act; and as discussed above, violations of the Act, while not negligence per se, are evidence of negligence. *Brooks v. Francis*, 57 N.C. App. 556, 291 S.E. 2d 889 (1982).").

- 40 -

family members.  Defendants had adequate time to repair and remedy the unsafe and unsanitary conditions after years of complaints and repair requests but have failed to make a reasonable effort to repair and remedy the defective conditions.

155.    Defendants breached their implied warranty of habitability resulting in damages to Plaintiffs.  Plaintiffs sustained damages as a result of Defendants' violation of N.C.G.S. § 42-42 including out-of-pocket costs and monies representing the overpayment of BAH rent amounts.

## SECOND CLAIM FOR RELIEF
### UDTPA

156.    Plaintiffs re-allege the above paragraphs 1 to 155 as if fully set forth herein.

157.    At all times relevant herein, Defendants were engaged in commerce in the State of North Carolina.  Defendants are proper defendants under the UDTPA.

158.    Plaintiffs are members of the consuming public as defined by UDTPA, as they sought to acquire goods and services by lease, namely a habitable, properly maintained residence from Defendants at Fort Bragg.

159.    Unfair and deceptive trade practices related to marketing of rental housing to prospective customers and in connection with performing landlord and property management duties are subject to the UDTPA because the rental of residential housing is considered commerce pursuant to N.C.G.S. § 75-1.1.

160.    The conduct of Defendants as set forth herein is against established public policy of the State; is unethical, oppressive, unscrupulous, and substantially injurious to consumers; and has the capacity and tendency to deceive the average consumer.

161.    Defendants, in the course of leasing to Plaintiffs, violated the UDTPA in multiple respects, including without limitation:

        A.    By breaching the implied warranty of habitability and the RRAA;

B. By engaging in an unconscionable course of action;

C. By using false, misleading, and deceptive practices in connection with marketing and property management services and in connection with website content meant to solicit applications from servicemembers;

D. By failing to correct defects and demanding continued rent payments after Defendants knew that the property management service provided by Defendants violated N.C.G.S. § 42-46 and the RRAA;

E. By failing to correct defects and demanding continue rent payments after Defendants knew that leased premises violated Cumberland County Code, Article IV, Minimum Housing Code, Division 2;

F. By labeling housing defects as "wear and tear" in effort to avoid repair and maintenance obligations;

G. By collecting rent after having knowledge of the uninhabitable nature of part and/or all of Plaintiffs' leased premises;

H. By failing to honor promises to correct deficiencies in Plaintiffs' leased premises and continuing to demand rent;

I. By misrepresenting the condition, fitness and habitability of rental home;

J. By employing a system for marketing, leasing and managing homes which is unfair, deceptive, and misleading, not permitted by the public policy of North Carolina, and in violation of N.C.G.S. § 42-46;

K. By utilizing false representations and deceptive measures to avoid incurring customer service and repair and maintenance costs as well as the costs of extensively renovating or replacing housing units;

L. By knowingly making false or misleading statements of facts concerning the need for parts, replacement, or repair service;

M. By knowingly making false or misleading statements of facts related to the cause of pervasive mold and/or structural wood rot in the leased premises;

N. By representing that work or services have been performed on, or parties replaced in, goods when the work or services were not performed or the parts replaced;

O. By failing to disclose information concerning defects known to Defendants;

- 42 -

P. By undertaking conduct which Defendants knew, or should have known, offended well-established public policy, state law, and was otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to Plaintiffs;

Q. By manipulating service and repair records; and

R. By manipulating customer survey records.

162. Some or all of the improper conduct alleged herein were done willfully, or with the conscious disregard of the rights of Plaintiffs.

163. Defendants received numerous complaints and repair requests, including those from Plaintiffs. Many of the conditions complained of were the same unfit conditions identified in the Environmental Baseline Survey and Defendants' housing inspections. Many others consisted of conditions and problems of which the Defendants had knowledge, because they had occurred before to prior tenants, while the incoming new tenant did not have this information.

164. Defendants, by virtue of their course of administering, leasing, building and repairing units at Fort Bragg were uniquely aware of the condition of them, including the existence of defective moisture barriers which caused mold, structural wood rot, and other potentially hazardous conditions across entire communities of old base housing. Nevertheless, Defendants knowingly and intentionally leased units to Plaintiffs and others, represented that they were habitable and that appropriate repair and remedy work had been undertaken in the past, and assured that it would be undertaken in the future. Had servicemembers had an adequate advance opportunity to properly inspect the units and review their prior repair and maintenance history before agreeing to ROAs, and had Defendants disclosed the true fact, they would not have entered into ROAs or, at very least, would have had a means to protest and seek not to overpay rent.

165. Defendants have utilized their relationship with the military, Plaintiffs' status within the military, Plaintiffs' relatively weaker economic position, and the availability (or lack

- 43 -

thereof) of military benefits associated with moving, to effectively hold Plaintiffs hostage in their leases until they received orders stationing them elsewhere.

166.     Despite the aforementioned violations, Defendants collected the full amount of the BAH directly from the federal government, giving Plaintiffs no discount for the size, quality, or condition of their house, nor for the inadequate repair and maintenance.

167.     In effort to further lessen their financial burden, Defendants refused to repair defects during tenancies by labeling them as "wear and tear" items which were not in need of replacement.

168.     Plaintiffs suffered actual injury as a direct and proximate result of Defendants' unfair and deceptive actions, including, but not limited to, the overpayment of rent.

169.     Defendants' actions were in or affecting commerce and constitute unfair and deceptive trade practices, proscribed by Chapter 75 of the North Carolina General Statutes.

170.     Plaintiffs have been damaged and are entitled to recover compensatory damages, treble damages and attorney's fees.

### THIRD CLAIM FOR RELIEF
#### Breach of Contract

171.     Plaintiffs re-allege the above paragraphs 1 to 170 as if fully set forth herein.

172.     This claim is brought only against Bragg Communities.[87] Plaintiffs entered into a valid contract with Defendant in the form of an ROA.

173.     The ROA and incorporated materials imposed explicit or implicit duties on Defendants Bragg Communities and Corvias Management, as owner and property manager respectively, to perform the contract so as to ensure the units were fit for human habitation. Defendants expressly warranted that units were "reasonably safe and habitable for occupancy."

---

[87] Order, Doc. 63, p. 20.

174.     Defendants failed to comply with the material terms of the ROAs by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation.

175.     During the pertinent times, Defendants breached provisions of the Corvias ROA form lease as well as of the Resident Responsibility Guide, incorporated by reference into the ROA.  Defendants breached their obligation set forth at Guide section 3-1 of "providing excellent maintenance service to residents."  Defendants breached their commitment set forth at Guide § 3-1 to "provide 24-hour emergency maintenance service to residents."  Defendants breached their commitment set forth at Guide § 3-1 that "[r]outine maintenance will also be accomplished quickly, efficiently, and according to the highest standards." They breached their promise set forth at Guide § 3-1 to perform under "[w]ork order guidelines" which would be "created with resident safety in mind."  Further, during the pertinent times, Defendants breached Guide § 1-2 wherein Corvias promised it "will assist current Residents with all housing needs concerning their current home."  Defendants further breached the terms of ROAs by failing to provide promised housing in the promised condition or to manage the tenant needs properly.

176.     It is well-established that a contract carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement.[88]  Accordingly, Plaintiffs allege breach of the implied covenant of good faith and fair dealing.

---

[88] *See Maglione v. Aegis Family Health Ctrs*., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) (In addition to its express terms, a contract contains all terms that are necessarily implied "to effect the intention of the parties" and which are not in conflict with the express terms. Among these implied terms is the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement. All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose); *Robinson v. Deutsche Bank Nat. Tr. Co.,* No. 52-CV-590, 2013 U.S. Dist. LEXIS 50797, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013) (accord).

177. In addition to the express terms of the ROA, there are terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.

178. Defendants had an implicit obligation to act in good faith and make reasonable efforts to perform their obligations under the ROA including, but not limited to, keeping the home safe and habitable, providing adequate repair and maintenance services, providing honest information to the tenants, and not using Defendants' vastly more powerful economic position to oppress and intimidate families.

179. Plaintiffs and reasonably understood and expected that Defendants would in accordance with their performance of the ROA:

> A. Communicate truthful information regarding known defects in military housing, including material facts regarding the condition of the leased home, of which Defendants had knowledge, and Plaintiffs lacked knowledge;
>
> B. Respond promptly, effectively, and truthfully to concerns about the condition of the unit expressed to them by Plaintiffs, including refraining from providing misinformation when responding to concerns;
>
> C. Faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, N.C.G.S. §§ 42-42, 42-46, and the Cumberland County Code;
>
> D. Maintain leased houses in good order and in a decent, safe and sanitary condition;
>
> E. Ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market-rate residential rental development in Fayetteville, North Carolina;
>
> F. Ensure that servicemembers and their families had quality housing generally reflecting contemporary community living standards;
>
> G. Refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

- 46 -

H.  Undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards and the representations made to induce families to lease;

I.  Maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from normal wear and tear;

J.  Make sure units are free from defects which would affect the safety, appearance, or habitability of the houses, and make sure that Units have components and construction to maintain safety;

K.  Inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

L.  To manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, No. 420-70-2;

M.  To provide a lead-hazard-free living environment; To inspect houses between occupancy to verify that previously controlled or abated lead hazards have not reoccurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

N.  To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS; and

O.  To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents.

180.  Defendants breached their contract and the implied covenant of good faith and fair dealing including, but not limited to, by engaging in the acts and omissions described hereinabove.

181.  Plaintiffs sustained damages as a result of Defendants' breaches of contract, including due to the overpayment of rent, as well as incurring of out-of-pocket expenses and other consequential and special damages in amounts to be proven at trial.

182.  As a proximate and legal result of Defendants' breaches of contract, Plaintiffs are entitled to compensatory damages.

- 47 -

## FOURTH CLAIM FOR RELIEF
### Negligence

183.    Plaintiffs re-allege the above paragraphs 1 to 182 as if fully set forth herein.

184.    Defendants owed duties to Plaintiffs as follows:

A.    To communicate truthful information regarding known defects in military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into residential leases;

B.    To respond promptly, effectively, and truthfully to concerns about the condition of the premises expressed to them by Plaintiffs, including refraining from providing misinformation when responding to concerns;

C.    To faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, N.C.G.S. § 42-46, and the Cumberland County Code;

D.    To maintain leased houses in good order and in a decent, safe and sanitary condition;

E.    To ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market rate residential rental development in Fayetteville, North Carolina;

F.    To ensure that servicemembers and their families had quality housing generally reflecting contemporary community living standards;

G.    To refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

H.    To undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

I.    To maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from fair wear and tear;

J.    To make sure family houses are free from missing components, or defects, which would affect the safety, appearance, or habitability or the houses;

- 48 -

K.  To inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

L.  To comply with the Department of the Army's adopted standards for the construction, renovation and condition of privatized housing;

M.  To comply with Army Pamphlet 420-1-1, § 2-29, as related to the maintenance of military housing;

N.  To manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, 420-70-2;

O.  To meet the standards of the American Society for Testing and Materials Sub-committee E06.23;

P.  To provide a lead-hazard-free living environment;

Q.  To conduct ongoing monitoring of military houses where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition, including procedures for performance of monitoring as set forth in HUD Guidelines, Chapter 6;

R.  To inspect houses between occupancy to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

S.  To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS;

T.  To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

U.  To adhere to the terms of the Ground Lease which require Defendants to remediate or remove any toxic or hazardous waste, substances, or materials in, on, under or from any part of the premises including but not limited to, lead-contaminated soil materials and pesticide-contaminated soil materials;

V.  To adhere to the terms of the Residential Leases;

W.  To adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

X.  To exercise reasonable care for the safety of foreseeable Plaintiffs;

Y.     To otherwise use reasonable care in the performance of Defendants' obligations as set forth in the Ground Lease and otherwise;

185.    Defendants breached their duties as follows with regard to Plaintiffs including by:

A.     Failing to communicate truthful information regarding known defects in military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into residential leases;

B.     Failing to respond promptly, effectively, and truthfully to concerns about the condition of the Units expressed by Plaintiffs, including refraining from providing misinformation when responding to said concerns;

C.     Failing to faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements including, but not limited to, North Carolina's Residential Rental Agreement Act, N.C.G.S. §42-46, and Cumberland County Code;

D.     Failing to maintain leased houses in good order and in a decent, safe and sanitary condition, both in terms of protecting Plaintiffs from water intrusion and mold, acting reasonably to respond to mold complaints, and otherwise;

E.     Failing to ensure professional management and maintenance of housing neighborhoods consistent with the standard of a market rate residential rental development in Fayetteville, North Carolina;

F.     Failing to ensure that families had quality housing generally reflecting contemporary community living standards;

G.     Failing to refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

H.     Failing to undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

I.     Failing to maintain homes, garages, carports, storage sheds, grounds and other facilities, to a standard that prevents deterioration beyond that which results from fair wear and tear;

- 50 -

J.      Failing to make sure family houses are free from missing components, or defects, which would affect the safety, appearance, or habitability or the houses;

K.      Failing to inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

L.      Failing to comply with the Department of the Army's adopted standards for the construction, renovation and condition of privatized housing;

M.      Failing to comply with Army Pamphlet 420-1-1, § 2-29, as related to the maintenance of military housing;

N.      Failing to manage lead-based paint in accordance with the standards and requirements established by the Army's Public Works Technical Bulletin, 420-70-2;

O.      Failing to meet the standards of the American Society for Testing and Materials Subcommittee E06.23;

P.      Failing to provide a lead-hazard-free living environment;

Q.      Failing to conduct ongoing monitoring of military houses where lead-contaminated paint is known or suspected to be present, regardless of the paint's present condition, including procedures for performance of monitoring as set forth in HUD Guidelines, Chapter 6;

R.      Failing to inspect houses between occupancy to verify that previously controlled or abated lead hazards have not recurred, to identify the occurrence and extent of new lead hazards, and to notify occupants that there is damage to painted surfaces;

S.      Failing to comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in the EBS;

T.      Failing to refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

U.      Failing to adhere to the terms of the Ground Lease which require Defendants to remediate or remove any toxic or hazardous waste, substances, or materials in, on, under or from any part of the premises including but not limited to, lead-contaminated soil materials and pesticide-contaminated soil materials;

- 51 -

V.     Failing to adhere to federal, state and local lead-based paint regulations as required by the Ground Lease and PWTB in the aforesaid particulars;

W.     Failing to adhere to the terms of the Residential Leases including, but not limited to, threatening punitive fees unless tenants agreed to sign new leases after initial lease terms expired

X.     Failing to exercise reasonable care for the safety of reasonably foreseeable Plaintiffs and victims of injury and illness as a consequence of breach of the duty of care; and

Y.     Failing to use reasonable care in performance of Defendants' obligations as set forth in the Ground Lease or otherwise.

186.    Defendants' breaches of duties constitute negligence, gross negligence, negligence *per se*, and/or reckless and willful conduct.

187.    As a proximate and legal result of Defendants' breaches of the duty of care, Plaintiffs have been injured.

188.    Plaintiffs have been injured as a result of Defendants' breaches of the duty of due care, including by suffering injury to personal property, and/or, by suffering injury to their person, adverse health effects, physical symptoms or significant illness, caused by mold exposure arising out of Defendants' negligence, or by other foreseeable impacts of the negligence; and have incurred out-of-pocket, actual, special or consequential damages.

189.    As a proximate and legal result of Defendants' negligence, recklessness, and gross negligence, Plaintiffs are entitled to an award of damages in amounts to be proven at time of trial. To the extent that Defendants' conduct was undertaken intentionally or with reckless disregard for the foreseeable consequences to Plaintiffs, and the requirements of N.C.G.S. § 1D-1 *et seq*. have been met by the evidence, Plaintiffs are entitled to exemplary or punitive damages.

## FIFTH CLAIM FOR RELIEF
### (Violation of Residential Lead-Based Paint Hazard Reduction Act)

190.    Plaintiff re-allege the above paragraphs 1 to 189 as if fully set forth herein.

191.     Defendants have violated applicable provisions and associated regulations of the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851, *et seq*.:

    A.    By failing to provide notice to Plaintiffs who were residents as articulated in 42 U.S.C. § 4852d;

    B.    By failing to provide said residents with any available reports or records pertaining to the presence of lead or lead-based paint hazards in the units;

    C.    By failing to notify said residents of their right to have a 10-day period to inspect the premises for lead prior to taking possession of the units; and

    D.    By failing to provide said residents with a 10-day period to inspect the premises for lead prior to taking possession of the units.

192.     Given their actual and constructive knowledge regarding the presence of lead-based paint in the leased premises, Defendants' failure to provide all of the statutorily required disclosures constituted a knowing violation of 42 U.S.C. § 4852d.  Further, the generic, inadequate and inaccurate purported lead disclosures in Defendants' form ROAs did not amount to satisfaction of their duties under this law.

193.     As a direct and proximate result of Defendants' conduct, Plaintiffs sustained actual damages including, without limitation, overpayment of rent given the fact the premises were not worth the amount paid in rent to Defendants.

194.     Per 42 U.S.C. § 4852d(b)(3), Defendants are jointly and severally liable to Plaintiffs in an amount equal to three times the amount of damages incurred by each such person.

195.     Per 42 U.S.C. § 4852d(b)(4), Defendants should be found jointly and severally liable for all applicable costs and expenses of this action, and reasonable attorneys' fees.

### SEVENTH CLAIM FOR RELIEF
**Temporary Recurrent Private Nuisance**

196.     Plaintiffs re-allege the above paragraphs 1 to 195 as if fully set forth herein.

- 53 -

197.    Plaintiffs who occupied the residential units during the pertinent times have standing to bring this claim due to their lawful possessory and occupancy interest.

198.    During the pertinent times, the Defendants proximately by its misuse of its ownership interest in the relevant housing unit and the military housing property at Fort Bragg, caused the Plaintiffs to incur a substantial and unreasonable interference with their ability to use and enjoy their leasehold property.

199.    As a direct and proximate result of Defendants' creation and maintenance of a temporary and recurrent private nuisance, the Plaintiffs have been injured and damaged.

200.    Furthermore, the nuisance conditions herein are abatable but Defendants have unreasonably refused to abate them.

201.    The nuisance herein was temporary and recurrent.

202.    As a result of the Defendants' creation and maintenance of a private nuisance, the Plaintiffs are entitled to compensatory damages for their discomfort, annoyance, aggravation, irritation and loss of use and enjoyment.

203.    As a result of the Defendants' creation and maintenance of a private nuisance, the Plaintiffs are entitled to compensatory damages in excess of $75,000.

## SEVENTH CLAIM FOR RELIEF
### Punitive damages

204.    Plaintiffs re-allege the above paragraphs 1 to 203 as if fully set forth herein.

205.    This claim is brought alternatively as a claim for relief or as a remedial allegation.

206.    The claim is brought against Defendant Bragg Communities, LLC alone.  Under the circumstances the owner/landlord defendant herein should be liable to the Plaintiffs for punitive damages.

- 54 -

207.    Under N.C.G.S. § 1D-15, punitive damages may be awarded if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud; (2) Malice; or (3) Willful or wanton conduct.  The claimant must prove the existence of an aggravating factor by clear and convincing evidence.

208.    Under the circumstances, there are adequate facts to demonstrate the existence of an aggravating factor within the meaning of Chapter 1D due to the commission of fraud.

209.    Under the circumstances, there are adequate facts to demonstrate the existence of an aggravating factor within the meaning of Chapter 1D due to the commission of malice or willful or wanton conduct. Willful or wanton conduct means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage or other harm. Willful or wanton conduct means more than gross negligence.

210.    The fraud, malice or willful or wanton conduct was related to the injury to the plaintiff for which the finder of fact may award relief under one or more of the merits claims which constitute adequate predicate claims for punitive damages.

211.    The Defendant's officers, directors or managers participated in or condoned the fraud and/or malice or willful or wanton conduct.

212.    The Plaintiffs are entitled to punitive damages in an amount reasonably needed to punish the defendant for egregiously wrongful acts committed against the plaintiff and to deter the defendant and others from committing similar wrongful acts, considering only that evidence which relates to the reprehensibility of the defendant's motives and conduct; the likelihood, at the relevant time, of serious harm to the plaintiff or others similarly situated; the degree of the defendant's

- 55 -

awareness of the probable consequences of its conduct; the duration of the defendant's conduct; the actual damages suffered by the plaintiff; any concealment by the defendant of the facts or consequences of its conduct; the existence and frequency of any similar past conduct by the defendant; whether the defendant profited by the conduct; and the defendant's ability to pay punitive damages, as evidenced by its revenues or net worth.

## JURY DEMAND

1.      Plaintiffs respectfully demand a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment in their favor against Defendants as follows:

1.      For a finding in Plaintiffs' favor on all causes of action and for an award of actual, compensatory, special, and consequential damages in an amount to be proven at trial;

2.      For an award of treble damages as provided by N.C.G.S. § 75-16;

3.      For an award of rent refund/restitution in an amount to be determined by the Court;

4.      For disgorgement of the profits and fees collected by Defendants;

5.      For an award of reasonable attorneys' fees and costs under N.C.G.S. § 75-16.1;

6.      For an award of punitive damages to the extent the evidence may show violation of Chapter 1D of the North Carolina General Statutes and proof of an aggravating factor; and

7.      For such other and further relief as the Court may deem just and proper.

Dated:  June 6, 2022.

WALLACE & GRAHAM, PA

/s/ John Hughes
Mona Lisa Wallace
NC State Bar No. 009201
John Hughes
NC State Bar No. 22126
525 N. Main Street
Salisbury, North Carolina 28144
Telephone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

BAUER & METRO, PC

/s/ Robert S. Metro
Robert S. Metro
S.C. Bar No. 69494
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297
Rmetro@bauerandmetro.com
(To appearing pursuant to Local Rule 83.1(e))

*Counsel for Plaintiffs*